Opinion issued August 6, 2020



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-19-00867-CV

———————————

## DWB CONSULTING, LLC, Appellant

## V.

## BENJAMIN RATLIFF, Appellee

---

**On Appeal from the County Court at Law No. 1
Galveston County, Texas
Trial Court Case No. CV-0082265**

---

## MEMORANDUM OPINION

In this interlocutory appeal, appellant, DWB Consulting, LLC (DWB)—a

Louisiana company with its principal place of business in Louisiana—challenges the

trial court's denial of its special appearance in a suit brought against it by appellee,

Benjamin Ratliff.[1] Ratliff, a Mississippi resident, sued DWB and three other companies, including Texas-based Hilcorp Energy Company (Hilcorp), for injuries he allegedly sustained performing his job duties aboard the inland barge rig *Bayou Blue* in Louisiana. Ratliff alleged that DWB acted as Hilcorp's agent and oversaw Hilcorp's operations in Louisiana.

In two issues, DWB challenges the trial court's order denying its special appearance, contending that (1) Texas's long-arm statute does not authorize personal jurisdiction in this case, and (2) DWB lacks the minimum contacts with Texas required by the Due Process Clause of the United States constitution for Texas courts to assert personal jurisdiction over it.[2] Regarding the second issue, DWB argues that it lacks minimum contacts with Texas because its only contact, a contract with a Texas company to provide consulting services outside of Texas, is not substantially connected to Ratliff's alleged injuries while lifting a heavy object aboard the *Bayou Blue* in Louisiana. Because we agree with DWB, we reverse the trial court's order denying DWB's special appearance and render judgment dismissing Ratliff's claims against DWB for lack of jurisdiction.

---

[1]   *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7) (permitting interlocutory appeal from order granting or denying special appearance).

[2]   DWB's brief lists three issues, but we construe his first two issues as a single issue challenging whether Ratliff met his initial burden to plead allegations sufficient to invoke jurisdiction under the Texas long-arm statute.

## Background

Ratliff filed suit against DWB and three other defendants, including Texas-based Hilcorp and Louisiana-based Baywater Drilling, LLC (Baywater),[3] alleging that, "[a]t all material times," he was "a Jones Act Seaman" employed by Baywater as a floorman aboard the vessel *Bayou Blue*. He asserted that "the *Bayou Blue* was deployed on navigable inland waters where [Ratliff] was contributing to and aiding such vessel to accomplish its mission." Ratliff claimed that, in May 2018, while working aboard the *Bayou Blue* "on inland waters outside the State of Texas," he was seriously injured "when he was required to manually lift large objects in excess of 300 pounds." He alleged that he had been required to perform the task "without adequate crew, and without conducting necessary safety meetings."

Ratliff sued for damages under the Jones Act,[4] Texas common law, and general maritime law. He alleged that the defendants, including DWB, had been "negligent and grossly negligent for the following reasons:

    a.     failing to properly train employees;

    b.     failing to inspect, maintain, and repair equipment;

    c.     fail[ing] to properly supervise their crew;

---

[3]    Ratliff also named as defendant another company, Baywater Drilling Management Partners, LP, which is not a party to this interlocutory appeal and does not appear to be integral to the discussion of the issue of personal jurisdiction.

[4]    46 U.S.C. § 30104.

> d. failing to maintain a safe work environment;
>
> e. failing to provide appropriate medical attention;
>
> f. fail[ing] to provide an adequate crew;
>
> g. fail[ing] to maintain the vessel;
>
> h. fail[ing] to provide necessary safety equipment;
>
> i. [being] vicariously liable for their employees' negligence and gross negligence;
>
> j. violating applicable Coast Guard, OSHA, and/or MMS rules and regulations;[5]
>
> k. violating their own safety rules and regulations;
>
> l. fail[ing] to comply with contractual obligations and duties; [and]
>
> m. failing to maintain safe mechanisms for work on the vessel[.]"

Ratliff also alleged that, "[a]t all relevant times, the *Bayou Blue* was unseaworthy" and that "DWB and its employees were acting as agents of . . . Hilcorp overseeing operations."

DWB filed a special appearance.[6] DWB asserted that the trial court lacked personal jurisdiction over it and requested that the trial court dismiss Ratliff's claims

---

[5] Neither the record nor the parties define "MMS."

[6] Baywater also filed a special appearance. *See Baywater Drilling, LLC, v. Benjamin Ratliff*, No. 01-19-00706-CV, 2020 WL 3422207 (Tex. App.—Houston [1st Dist.] June 23, 2020, no pet. h.) (reversing denial of Baywater's special appearance). The only parties to this interlocutory appeal are DWB and Ratliff.

against it. DWB averred that Ratliff's petition did not allege any connection between DWB's contacts with Texas and the operative facts of the litigation.[7]

DWB supported its special appearance with the affidavit of Douglas Burch, the principal, owner, sole member, and sole employee of DWB. Burch testified that DWB is a Louisiana limited liability company with its principal place of business in Louisiana and offices in Houma, Terrebonne Parish, Louisiana. He averred that DWB has no offices or employees in Texas, owns no property in Texas, and does not advertise, have bank accounts, or pay taxes in Texas. He further averred that DWB performed no work in Texas, has no authorized agent to accept service of process in Texas, and was not served with citation in this case in Texas. Rather, Burch testified that the "vast majority" of DWB's consulting work occurred in Louisiana and "none occur[ed] in . . . Texas." Burch testified that DWB was an independent contractor of Hilcorp at the time Ratliff was injured, and Burch denied that DWB was Hilcorp's agent.

After deposing DWB's corporate representative, Burch, Ratliff responded to DWB's special appearance. Ratliff argued that the trial court had personal jurisdiction over DWB because "DWB: (1) conducts exclusive business with a

---

[7] DWB's special appearance also argued that the trial court lacked general personal jurisdiction over it and that exercising jurisdiction over it offended traditional notions of fair play and substantial justice.

5

Texas citizen; (2) works for a Texas citizen; (3) consistently communicates with a Texas citizen; and (4) benefits from conducting business in Texas." Ratliff pointed to Burch's testimony acknowledging that, by entering into a contract with a Texas company, DWB potentially could be sued in Texas based on "[a] contractual disagreement between Hilcorp and [DWB] . . . ." Ratliff also pointed to Burch's testimony agreeing that, "[f]rom 2014 [to] . . . 2019, [DWB's] exclusive business relationship as a consultant ha[d] been with Hilcorp[.]" Ratliff further pointed to Burch's testimony that while Burch, as DWB's employee, worked on the *Bayou Blue*, he communicated daily with Hilcorp's "operations engineer in the particular field" by texts, telephone calls, and emails. Ratliff attached as evidence Burch's entire deposition transcript and many of DWB's discovery responses.

DWB filed a reply in support of its special appearance, acknowledging its consulting contract with Texas-based Hilcorp but denying that the contract had anything to do with Ratliff or the damages he allegedly sustained in Louisiana. DWB argued that no part of its contract with Hilcorp was to be performed by either party in Texas. DWB's reply attached a medical statement addressed to Ratliff at a Mississippi mailing address. DWB also attached a second affidavit from Burch, in which Burch testified that "DWB is a consulting firm specializing in oil and gas" and that DWB "provides oil and gas operators with consulting advice, information, recommendations, and strategies for optimizing well operations. It does not provide

6

any other services." Burch further testified that DWB did not supervise, manage, or oversee any employees, including Ratliff, or operate any of the barges or equipment, but "is strictly hired to consult[] on the optimization of well operations." Burch confirmed that "DWB ha[d] consulted exclusively in Louisiana" since 2012 and that, "[s]ince 2014, DWB ha[s had] only one client: Hilcorp[.]" Burch also denied that either he or DWB performed any of the actions alleged in Ratliff's petition.

Neither party introduced the contract between DWB and Hilcorp, and it is not a part of the record on appeal. There is no evidence that the contract was signed in Texas. Burch testified that Hilcorp's payments to DWB for DWB's services were drawn on a Utah bank.

The trial court conducted a hearing on DWB's special appearance. The parties reiterated their arguments and no additional evidence was taken. Following the hearing, the trial court signed an order denying DWB's special appearance. DWB filed this interlocutory appeal, challenging the trial court's order in two issues.

## Special Appearance

### A. Standard of Review

Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law that we review de novo. *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018). When, as here, a trial court does not issue findings of fact or conclusions of law with its ruling on a special appearance, all relevant facts

7

necessary to support the judgment and supported by evidence are implied. *Id.*; *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). When the record on appeal includes the clerk's and reporter's records, the trial court's implied findings are not conclusive and may be challenged for legal and factual sufficiency. *BMC Software*, 83 S.W.3d at 795. A no-evidence legal sufficiency challenge fails if the finding is supported by more than a scintilla of evidence. *Id.*

## B.      Governing Law

Texas courts may exercise personal jurisdiction over a nonresident defendant if: (1) the Texas long-arm statute authorizes the exercise of jurisdiction; and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). The Texas long-arm statute is expressly satisfied if a nonresident commits a tort in whole or in part in Texas or contracts with a Texas resident and the contract is to be performed wholly or partially in Texas. *See id.* (citing TEX. CIV. PRAC. & REM. CODE ANN. § 17.042(1), (2)). Texas courts interpret the long-arm statute to "reach as far as the federal constitutional requirements of due process will allow." *Id.* at 575 (quoting *Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991)).

"[F]ederal due process requires that the nonresident must have 'certain minimum contacts with [the forum state] such that the maintenance of the suit does

not offend traditional notions of fair play and substantial justice.'" *Old Republic*, 549 S.W.3d at 559 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945), and *Moki Mac*, 221 S.W.3d at 575). A nonresident establishes minimum contacts with a forum when it "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Moki Mac*, 221 S.W.3d at 575 (quoting *Hanson v. Denckla*, 375 U.S. 235, 253 (1958), and *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005)). The defendant's in-state activities "must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Old Republic*, 549 S.W.3d at 559 (quoting *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009)). Three important considerations guide our review of a nonresident's contacts with the state: (1) only the defendants' contacts with the forum are relevant, not the unilateral activity of another party or a third person; (2) the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated; and (3) the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. *Id.* (quoting *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 151 (Tex. 2013)).

A defendant's contacts may give rise to general jurisdiction, which is not at issue here, or specific jurisdiction. *Id.* (citing *Moncrief Oil*, 414 S.W.3d at 150). To constitute the minimum contacts required for a Texas court to exercise specific

9

personal jurisdiction over a nonresident defendant: (1) the defendant's contacts with Texas must be purposeful, and (2) the cause of action must arise from or relate to those contacts. *Id.* (citing *Moncrief Oil*, 414 S.W.3d at 150, and quoting *Michiana Easy Livin' Country*, 168 S.W.3d at 795). For a cause of action to arise from or relate to purposeful forum contacts, "there must be a substantial connection between those contacts and the operative facts of the litigation." *Moki Mac*, 221 S.W.3d at 585 (citing *Rush v. Savchuk*, 444 U.S. 320, 329 (1980), and *Guardian Royal*, 815 S.W.2d at 229–33).

When a nonresident defendant challenges personal jurisdiction over it, the plaintiff and defendant bear shifting burdens of proof. *Old Republic*, 549 S.W.3d at 559 (citing *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010)). The plaintiff bears the initial burden of pleading allegations sufficient to invoke jurisdiction under the long-arm statute. *Id.* If the plaintiff pleads sufficient jurisdictional allegations, the burden shifts to the nonresident defendant to negate all bases of jurisdiction alleged. *Id.* The defendant can meet this burden to negate jurisdiction by, for example, "showing that 'even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction' or that 'the defendant's contacts with Texas fall short of purposeful availment.'" *Id.* (quoting *Kelly*, 301 S.W.3d at 659).

## C.    Analysis

In its second issue, DWB contends that, based on the allegations in Ratliff's petition and the evidence in the record, the trial court erred when it denied DWB's special appearance.[8] DWB primarily asserts that its consulting contract with Texas-based Hilcorp—which it contends is its only contact with Texas—is not substantially connected to Ratliff's alleged injuries in Louisiana. DWB contends that, therefore, it is not subject to specific personal jurisdiction in Texas courts.

Ratliff does not dispute that general jurisdiction does not apply to this case or that his tort claims arose wholly in Louisiana. Instead, Ratliff counters that DWB had "a fourteen-year-long, exclusive business relationship" with Texas-based Hilcorp and, "[p]ursuant to its longstanding contract," DWB oversaw Hilcorp's operations on the *Bayou Blue*, communicated daily with Hilcorp in Texas, received training from Hilcorp, and received daily instruction "on where, when, and how to perform the work" from Hilcorp in Texas. Ratliff argues that DWB negligently

---

[8]    In its first issue, DWB contends that Ratliff did not sufficiently plead jurisdictional allegations in his petition. We need not address this argument because, as discussed *infra*, we agree with DWB that, considering all the allegations and record evidence, Texas courts lack specific personal jurisdiction over DWB. *See M&F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co., Inc.*, 512 S.W.3d 878, 886 n.10 (Tex. 2017) (stating that court need not reach defendants' alternate argument that plaintiff had not sufficiently pleaded jurisdictional facts because, after considering all evidence, Texas courts lacked personal jurisdiction over defendants); *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007) (stating that Texas courts interpret long-arm statute to "reach as far as the federal constitutional requirements of due process will allow").

carried out the safe operation of the *Bayou Blue* and that Ratliff's injuries "were the direct result of DWB's failure to discharge its duties as Hilcorp's representative with reasonable care—duties it would not otherwise have had in the absence of its relationship with Hilcorp." Ratliff further argues that "whether DWB performed its responsibilities as Hilcorp's man-on-the-ground with reasonable care, [is a] key operative fact[] that the jury must determine in this case." Ratliff relies on the allegations in his petition and the deposition testimony of Burch in his capacity as DWB's representative.

As an initial matter, Ratliff lacks support for his arguments that DWB had a fourteen-year relationship with Hilcorp, that DWB oversaw Hilcorp's operations or acted as Hilcorp's agent or representative, and that DWB communicated daily with and received daily instruction from Hilcorp in Texas. The record on appeal does not include the contract upon which Ratliff primarily relies for his arguments. Moreover, Burch initially testified at his deposition that DWB had contracted with Hilcorp since 2004, but he immediately corrected the date to 2014, which Ratliff's counsel accepted. DWB has consistently maintained that its relationship with Hilcorp began in 2014 for the remainder of Burch's deposition, in both of Burch's affidavits as DWB's corporate representative, and in DWB's discovery responses. There is no record evidence controverting Burch's testimony and DWB's discovery responses on this issue.

12

Likewise, DWB has consistently denied that it oversaw Hilcorp's operations, acted as Hilcorp's agent, or employed, supervised, or controlled Ratliff. Rather, Burch testified that he is a petroleum engineer who, as DWB's sole member and employee, provided "consulting advice, information, recommendations, and strategies for optimizing well operations" to Hilcorp in Louisiana. Burch also testified that DWB's point of contact with Hilcorp was an operations manager for Hilcorp in the field and that Burch communicated with the field operations engineer as needed by texts, telephone calls, and emails.

There is no evidence that DWB communicated daily with or received daily instruction from Hilcorp in Texas or that it otherwise oversaw Hilcorp's operations or acted as Hilcorp's agent aboard the *Bayou Blue*. *See Old Republic*, 549 S.W.3d at 558 (authorizing reviewing court to consider implied findings supported by record evidence). Ratliff did not provide sworn testimony contradicting DWB's sworn testimony, and thus DWB's evidence is not controverted. To the extent that the trial court's order denying DWB's special appearance relied on any of these allegations, they are not supported by more than a scintilla of evidence and are therefore legally insufficient to support the trial court's order. *See BMC Software*, 83 S.W.3d at 795.

Burch also testified that DWB did not conduct any business in Texas, that it had no employees, offices, or bank accounts in Texas, that it did not advertise in Texas, and that it was not served with citation in this case in Texas. Ratliff's alleged

13

injury did not occur in Texas, and neither party is a Texas resident or entity. Burch testified that DWB performed its contractual consulting obligations solely in Louisiana and that Hilcorp's payments to DWB were drawn on a Utah bank. Therefore, on this record, DWB's only forum contact is its consulting contract with a Texas company from which DWB earned its income for the four years preceding Ratliff's alleged injury. Generally, contracting with a Texas company alone is insufficient to establish minimum contacts. *See Michiana Easy Livin' Country*, 168 S.W.3d at 786 ("[T]he United States Supreme Court has emphatically answered the question whether a single contract with a Texas resident can automatically establish jurisdiction—'the answer clearly is that it cannot.'") (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 475 n.18, 478 (1985)); *Gulf Coast Int'l, L.L.C. v. Research Corp. of the Univ. of Haw.*, 490 S.W.3d 577, 585 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) ("[C]ontracting with a Texas company . . . do[es] not necessarily establish sufficient minimum contacts to demonstrate specific jurisdiction."). But, even assuming without deciding that DWB purposefully availed itself of the privilege of conducting activities in Texas by entering into a consulting contract with a Texas company from which DWB derived all of its income over a four-year period, personal jurisdiction over DWB is proper only if DWB's purposeful contact is substantially connected to the operative facts of Ratliff's negligence and gross

14

negligence claims against DWB. *See Old Republic*, 549 S.W.3d at 559; *Moki Mac*, 221 S.W.3d at 585. On this record, we decline to hold that it is.

Ratliff's negligence claims specifically allege that he was required to lift heavy objects without an adequate crew and without necessary safety meetings and that DWB failed to, among other things, train and supervise employees, maintain a safe working environment and equipment, and comply with its contractual duties on the *Bayou Blue*. Ratliff's only reliance on DWB's consulting contract is to establish that DWB owed him a legal duty, which is generally a legal question for the trial court to resolve prior to trial unless a fact issue precludes a decision as a matter of law. *See Boerjan v. Rodriguez*, 436 S.W.3d 307, 310–11 (Tex. 2014); *Helbing v. Hunt*, 402 S.W.3d 699, 703 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). Indeed, Ratliff implicitly acknowledges the limited relevancy of DWB's contract by arguing that DWB breached "duties it would not otherwise have had in the absence of its relationship with Hilcorp." But Ratliff did not introduce the contract, and it is not a part of the record before us.

The focus of the trial will be on DWB's actions and conduct on the *Bayou Blue*, where Ratliff was allegedly injured, rather than on DWB's consulting contract with Hilcorp. *See Moki Mac*, 221 S.W.3d at 588 (finding that operative facts of negligence claim principally concerned guides' conduct on hiking trail where injury occurred and thus focus of trial would be on guides' conduct and events on trail).

15

DWB owed contractual obligations to Hilcorp, including providing Hilcorp with consulting advice, information, recommendations, and strategies for optimizing well operations. However, there is no record evidence that DWB oversaw, managed, or supervised any employees, including Ratliff, or operated any of the barges or equipment. Thus, the uncontroverted record evidence shows that DWB's contract had nothing to do with Ratliff's lifting of heavy objects on the *Bayou Blue* and, therefore, the contract is not substantially connected to this personal injury lawsuit. *See BMC Software*, 83 S.W.3d at 797 (reversing trial court's denial of special appearance where no evidence supported finding that tort was committed in whole or in part in Texas).

We offer no opinion on whether Ratliff will ultimately prevail on his negligence claims against DWB, but we cannot say, on the record before us, that DWB's contracting with a Texas company to provide consulting services in Louisiana justifies a conclusion that DWB could reasonably anticipate being called into a Texas court to answer Ratliff's claims of negligence that occurred in Louisiana. *See Old Republic*, 549 S.W.3d at 559; *id.* at 560 ("[W]e have cautioned that we must not confuse 'the roles of judge and jury by equating the jurisdictional inquiry with the underlying merits.'"). On this record, the uncontroverted evidence shows that Ratliff's negligence claims against DWB do not arise from or relate to DWB's contacts with Texas.

16

Our decision is guided by *Moki Mac River Expeditions v. Drugg*, in which the Texas Supreme Court considered whether a Texas resident's hiking injury while on a guided rafting trip in Arizona arose from or related to the hiking guide's extensive advertising, marketing, and sales of such trips to Texas residents. *Moki Mac*, 221 S.W.3d at 573. The Druggs sent their son, Andy, on a rafting trip in Arizona where he was fatally injured while hiking. *Id.* The Druggs had contacted Moki Mac River Expeditions (Moki Mac), a Utah company, about the rafting trip and had sent an application and payment for Andy and his grandmother to go on the trip. *Id.* Moki Mac sent safety and release forms to the Druggs at their home in Texas, and the Druggs signed and returned the forms to Moki Mac. *Id.* After Andy's accident, the Druggs sued Moki Mac in Texas for negligence, arguing that Moki Mac's extensive sales, marketing, and advertising efforts in Texas and its numerous communications with Texas residents constituted minimum contacts with Texas sufficient to exercise jurisdiction over it here. *Id.* at 577–78. The Druggs argued that they would not have sent Andy on the trip without Moki Mac's representations, made in direct solicitations, about the safety of its trips. *Id.* at 585. Yet the court rejected the Druggs' but-for argument, holding instead that there must be a substantial connection between a nonresident defendant's forum contacts and the operative facts of the litigation. *Id.* Thus, the court concluded that Moki Mac's promotional

17

materials that it sent to Texas were not substantially connected to the operative facts of Andy's death while hiking in Arizona:

> [T]he operative facts of the Druggs' suit concern principally the guides' conduct of the hiking expedition and whether they exercised reasonable care in supervising Andy. The events on the trail and the guides' supervision of the hike will be the focus of the trial, will consume most if not all of the litigation's attention, and the overwhelming majority of the evidence will be directed to that question. Only after thoroughly considering the manner in which the hike was conducted will the jury be able to assess the Druggs' misrepresentation claim. In sum, the [alleged misrepresentation] is not the subject matter of the case . . . nor is it related to the operative facts of the litigation." Whatever connection there may be between Moki Mac's promotional materials sent to Texas and the operative facts that led to Andy's death, we do not believe it is sufficiently direct to meet due-process concerns.

*Id.* at 588 (quoting *Rush*, 444 U.S. at 329).

Here, DWB's sole contact with Texas—a single contract with a Texas company to provide oil well consulting services in Louisiana—is more tenuous than Moki Mac's extensive sales, marketing, and advertising efforts in Texas to Texas residents. *See id.* at 585 ("Whatever connection there may be between Moki Mac's promotional materials sent to Texas and the operative facts that led to Andy's death, we do not believe it is sufficiently direct to meet due-process concerns."); *Gulf Coast Int'l*, 490 S.W.3d at 585 ("[C]ontracting with a Texas company . . . do[es] not necessarily establish sufficient minimum contacts to demonstrate specific jurisdiction.").

Ratliff argues that "his injuries were the direct result of DWB's failure to discharge its duties . . . [that] it would not otherwise have had in the absence of its relationship with Hilcorp," but this argument relies on a but-for causation standard that *Moki Mac* held was insufficient to establish minimum contacts with a forum state. *See Moki Mac*, 221 S.W.3d at 581 (stating that "the but-for test [is] too broad and judicially unmoored to satisfy due-process concerns" regarding personal jurisdiction). Rather, due process requires the operative facts of the litigation to be substantially connected to the nonresident defendant's forum contacts before the forum may exercise jurisdiction over the nonresident defendant. *Id.* at 585. Just as the operative facts leading to Andy's death in Arizona were not substantially connected to Moki Mac's extensive advertising of its trips to Texas residents, the operative facts leading to Ratliff's alleged injury from lifting heavy objects on a vessel in Louisiana are not substantially connected to DWB's consulting contract with a Texas company. *Cf. TV Azteca v. Ruiz*, 490 S.W.3d 29, 53 (Tex. 2016) (distinguishing *Moki Mac* because Moki Mac's "'actionable conduct,' from which the claim arose, occurred in Arizona, and its 'additional conduct' of advertising in Texas did not transform its actionable conduct in Arizona into a contact with Texas"). DWB's contract with Hilcorp is relevant only to the existence or not of a legal duty owed by DWB to Ratliff, which is generally a question of law rather than a focus at trial, particularly if it is found that no legal duty was owed. *See Boerjan*,

19

436 S.W.3d at 307. DWB's conduct on the *Bayou Blue*—and not its consulting contract—"will consume most if not all of the litigation's attention, and the overwhelming majority of the evidence will be directed to that question." *See Moki Mac*, 221 S.W.3d at 585. "Only after thoroughly considering the manner in which [the operations on the *Bayou Blue*] [were] conducted will the jury be able to assess [Ratliff's negligence] claim[s]." *See id.*

Ratliff also relies on *Nogle & Black Aviation, Inc. v. Faveretto*, but that reliance is misplaced. *See* 290 S.W.3d 277 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Whereas *Moki Mac* held that a nonresident defendant's extensive contacts with Texas were not substantially connected to the operative facts of the litigation, *Nogle* held that a nonresident defendant's limited contacts were "directly related" to the operative facts of the litigation. *Compare Moki Mac*, 221 S.W.3d at 588, *with Nogle*, 290 S.W.3d at 283–85. In *Nogle*, a student pilot was killed when a wing broke off the Beechnut T-34 airplane he was flying in Texas, causing the airplane to crash. *Nogle*, 290 S.W.3d at 280. The pilot's estate sued N&B, an Illinois aircraft company, alleging that it had negligently designed and installed the wings of the T-34 that crashed. *Id.* at 283. After previous crashes related to the T-34's wings, N&B designed repair procedures to make T-34s airworthy, received approval from the Federal Aviation Administration for its repair procedures, and then sold its wing-repair designs to other T-34 owners. *Id.* at 280, 282–83. The owner of the T-34 that

20

crashed in *Nogle* had bought N&B's design and used it to repair the T-34 "[s]everal months" before it crashed. *Id.* at 280. N&B's only contacts with Texas were that it sought out and contracted with a Texas engineer to design the wing-repair procedures, the engineer performed the work in Texas, and N&B used the Texas engineer's design and sold it for profit to other T-34 owners. *Id.* at 282–83. Based on these contacts, the court determined not only that N&B purposefully availed itself of the privilege of conducting activities in Texas, but also that these contacts were substantially connected to the operative facts of the litigation because "[t]he issue of whether negligence in the design and inspection of the wing spar modification . . . caused the wing separation on the accident aircraft is an operative fact in this litigation, and [the Texas engineer's] engineering work is directly related to that." *Id.* at 283–85.

Here, by contrast, DWB's consulting contract—which is not a part of the record—is not directly related to the operative facts of the litigation. As we discussed above, the contract is only relevant to the existence of a legal duty, which is generally a legal question decided by the court before trial and, thus, is not an operative fact because it will not be the focus of the trial. *See Boerjan*, 436 S.W.3d at 310–11; *Moki Mac*, 221 S.W.3d at 588. N&B's relationship with the Texas engineer, on the other hand, went beyond merely establishing N&B owed the student pilot a legal duty. *Nogle*, 290 S.W.3d at 284. The operative facts of that litigation concerned whether

21

N&B breached a duty in its design and whether such a breach caused the student pilot's death. *Id.* The Texas engineer's design of the repair procedures in Texas for N&B was "directly related" to N&B's alleged negligence. *Id.* Because the issue of DWB's contract is not substantially connected, much less directly related, to the operative facts in this litigation, *Nogle* does not support personal jurisdiction in this case. *See id.* We therefore hold, on the record before us, that Texas courts lack personal jurisdiction over DWB for Ratliff's negligence claims against it.

Like his negligence claims, Ratliff's gross negligence claims against DWB do not arise from or relate to DWB's consulting contract. These claims will focus on DWB's actions on the *Bayou Blue* in Louisiana, whether those actions involved an extreme degree of risk, and whether DWB was actually, subjectively aware of the risk involved. *See Boerjan*, 436 S.W.3d at 311 ("Gross negligence requires a showing of two elements: '(1) viewed objectively from the actor's standpoint, the act or omission complained of must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed[s] in conscious indifference to the rights, safety, or welfare of others.'") (quoting *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001), and TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11)). DWB's consulting contract is not substantially connected to the operative facts of Ratliff's gross negligence claims.

22

Therefore, on this record, we conclude that Ratliff's gross negligence claims against DWB do not arise from or relate to DWB's contacts with Texas. We hold that the trial court lacked personal jurisdiction over DWB for Ratliff's gross negligence claims.

We sustain DWB's second issue.

## Conclusion

We reverse the trial court's order denying DWB's special appearance and render judgment dismissing Ratliff's claims against DWB for lack of jurisdiction.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Kelly, and Landau.